## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**BRUCE A. SALMONS,**

    **Plaintiff,**

**v.**                                        **Case No. 3:09-cv-01268**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

    **Defendant.**

### MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 2). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 7 and 8). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 15, 16, 18 and 19).

### I. Procedural History

Plaintiff, Bruce A. Salmons (hereinafter "Claimant"), applied for DIB benefits on June 18, 2007, alleging disability beginning April 26, 2006 due to a "neck injury, lower back problems, arm problems, right hip problems, right leg problems, and high blood pressure." (Tr. at 124, 138-139). The application was denied initially and upon reconsideration. (Tr. at 8). Thereafter, Claimant requested an administrative hearing,

which was held on March 16, 2009 before the Honorable Andrew J. Chwalibog, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 17-40). By decision dated April 23, 2009, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 7-14).

The ALJ's decision became the final decision of the Commissioner on September 22, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On November 20, 2009, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 10, 11, 15, 16, 18, and 19). Therefore, the case is ripe for resolution.

## II.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third

inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits. However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant met the insured status requirements of the Social Security Act through December 31, 2011. (Tr. at 10, Finding No. 1). The ALJ found that Claimant satisfied the first step of the sequential evaluation because he had not engaged in substantial gainful activity since the date of the alleged onset of disability. The ALJ noted that Claimant

had briefly worked after the alleged onset date, but the ALJ found this effort to constitute an unsuccessful work attempt. (Tr. at 10, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of cervical degenerative disc disease with carpal tunnel syndrome and ulnar neuropathy. He further determined that Claimant had non-severe impairments of diabetes mellitus, hypertension, and heart disease. (Tr. at 10, Finding No. 3). Nonetheless, at the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 11, Finding No. 4). The ALJ then found that Claimant had the following residual functional capacity:

> Light work as defined in 20 C.F.R. 404.1567(b) except: may lift and/or carry ten pounds frequently and twenty pounds occasionally; may never climb ladders/scaffolds; may only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to temperature extremes, vibration or concentrated exposure t0 hazards (machinery, heights, etc.).

(Tr. at 11-14, Finding No. 5).

As a result, Claimant could not return to his past relevant employment as a welder, which was considered heavy, semi-skilled work. (Tr. at 14, Finding No. 6). The ALJ considered that Claimant was 44 years old at the time of the disability onset date, which defined him as a "younger individual age 18-49," and that he had a high school education and could communicate in English. (*Id.*, Finding Nos. 7 and 8). The ALJ noted that transferability of skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Claimant had transferable job skills. (*Id.*, Finding No. 9). In view of these factors and based on the evidence of record and the vocational expert's testimony, the ALJ concluded that Claimant could perform jobs such as light cleaner, light production inspector, sedentary

assembler, and sedentary surveillance system monitor, all of which exist in significant numbers in the national and regional economy. (Tr. at 14-16, Finding No. 10). On this basis, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 16, Finding No. 11).

### III.    <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).  The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*  The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a

claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

A careful review of the record reveals that the decision of the Commissioner is supported by substantial evidence.

## IV.   **Claimant's Background**

Claimant was born in 1961 and was 47 years old at the time of his administrative hearing. (Tr. at 22). He was a high school graduate and could speak and read English. (Tr. at 23). In the fifteen years preceding his alleged onset of disability, Claimant was employed primarily as a welder in the coal industry. (Tr. at 24).  He ceased working after sustaining a neck injury at work. (Tr. at 139).

## V.   **Relevant Medical Evidence**

The Court reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence.   To the extent that the Claimant's medical treatment and evaluations are relevant to the issues in dispute, the Court summaries them as follows:

### A. Summary of Treatment

On May 17, 2006, Claimant presented to the Emergency Department ("ED") at Cabell Huntington Hospital ("CHH") complaining of neck pain that radiated down both arms causing a "pins and needles" sensation.  (Tr. at 210).  He attributed the pain to a fall he had suffered at work one week earlier.  *(Id.).*  The ED physician ordered a CT scan of Claimant's head and cervical spine.  The head imaging was normal except for an ancillary finding of chronic sinusitis.  (Tr. at 216-217).  The cervical imaging revealed degenerative changes in the "mid to lower cervical spine with mild bony canal stenosis evident at C4-5."  *(Id.).* There was no evidence of acute injury.  The ED physician diagnosed "cervical injury," prescribed twelve Lortab, and instructed Claimant to take 1-

2 days off of work and see his family physician.  (Tr. at 209, 211, and 214).

Two days later, Claimant went to the office of Dr. Rodney Thompson, a local chiropractor, for evaluation and treatment.  (Tr. at 353-355).  Claimant explained that he had suffered a work injury on April 26, 2006, indicating that he had lost his balance and fallen backwards.  He caught himself with his left arm, but hurt his neck in the process.  (*Id.*).  Claimant described the pain as starting in his neck and shoulders, then traveling down both arms and causing a "pins and needles" feeling.  He also complained of pain in his spine that radiated into his right leg.  (*Id.*).  Dr. Thompson performed an evaluation, including range of motion, straight leg testing, and a motor strength assessment.  He found Claimant to have tenderness and pain in his lumbar spine; limited range of motion in both his lumbar and cervical spine; positive straight leg raising; muscle spasms; decreased right leg strength, but normal upper extremity reflexes and muscle strength.  (*Id.*).

Later on the same day, Claimant consulted with Dr. Robert Turner, a family practitioner at Huntington Internal Medicine Group ("HIMG").  (Tr. at 279-280).  Claimant indicated that he had injured his neck when he fell at work while changing a machine filter.  He snapped his neck during the fall and had been having severe neck pain since that time.  (*Id.*).  Claimant reported that he did not regularly see a primary care physician, having last consulted with Dr. Carico approximately seven years earlier.  Claimant had been sent to Dr. Turner's office by Dr. Thompson, who had found Claimant's blood pressure to be extremely elevated earlier that day during a chiropractic session.  *(Id.).*  Dr. Turner performed a physical examination, but was most concerned with Claimant's hypertension.  He advised Claimant that he would not treat him for his work-related injury, because he did not want to "see him for Workers Compensation,"

but would see him for general medical care.  Dr. Turner prescribed an anti-hypertensive, Lotrel, and Lortab.  He recommended that Claimant obtain a blood pressure monitor for home use and schedule an appointment with his prior physician, Dr. Gregory Carico. (*Id.*).

Claimant returned to Dr. Thompson's office on May 22, 2006 where he received an adjustment and cervical traction.  (Tr. at 352).  He was told to come back to the office soon, so that he could be treated while his symptoms were acute.  He returned four more times in May; thirteen times in June; four times in July; and once in August.  (Tr. 341-352).  During this treatment period, Claimant underwent a second MRI of his cervical spine.  (Tr. at 340).  The result of the study was "cervical degenerative disc disease and spondylosis being most advanced at C4-5 where there is severe acquired canal stenosis and neural foraminal encroachment with evidence of compressive myelopathy." (*Id.*). Dr. Thompson continued providing Claimant with chiropractic treatment, documenting on August 25, 2006 that Claimant complained of worsening pain in his neck and down his right arm.  (Tr. at 341).  Claimant described an incident of motor control loss when bending forward to pick up a shoe.  Dr. Thompson indicated that Claimant had an appointment scheduled with Dr. Rida Mazagri, a local neurosurgeon.  (*Id.*).  On November 7, 2006, Dr. Thompson noted that Claimant had advised the office that Workers Compensation was transferring his care to Dr. Mazagri.  ((*Id.*).

On September 27, 2006, Claimant saw Dr. Mazagri for the first time.  (Tr. at 259-261).  His chief complaint at that visit was pain in the neck and both arms with tingling, numbness and weakness.  He also complained of lower back pain.  Dr. Mazagri documented that Claimant was taking pain medication and Lyrica and had received chiropractic care, but was still symptomatic.  (*Id.*).  Upon physical examination,

Claimant had normal muscle strength and sensation in all four extremities; his deep tendon reflexes were exaggerated; his gait was normal, including toe and heel walking; his cervical spine was tender; and his neck movements were restricted in lateral rotations and lateral bending. (*Id.*). Dr. Mazagri diagnosed neck pain and both arm radiculopathy "most probably related to disk herniation with cord compression, cervical myelopathy as well" and recommended an anterior cervical diskectomy, cord decompression and fusion with bone grafting and plating. (*Id.*).

In a follow-up visit on December 6, 2006, Dr. Mazagri noted that Claimant continued to have symptoms, but Worker's Compensation had not yet authorized the recommended surgical procedures, because there was a dispute over the cause of his injury. (Tr. at 264). Dr. Mazagri again requested authorization from Worker's Compensation to proceed with the operation.

On December 11, 2006, Claimant returned to HIMG where he saw Dr. Carico. (Tr. at 278). Dr. Carico commented that Claimant's blood pressure medication was not "doing a good job for him." However, Dr. Carico felt much of the problem was related to Claimant's frustration over Worker's Compensation. (*Id.*). Claimant explained that Worker's Compensation was pointing to his pre-existing degenerative disc disease as the cause of his current symptoms and did not want to pay for the surgery. Claimant indicated that he needed to work and believed that the surgery would improve his physical condition and let him get back to work. (*Id.*).

On January 30, 2007, Claimant underwent an anterior cervical diskectomy and foraminotomy and fusion, C4-5, with bone graft filled with bone chips performed by Dr. Mazagri. (Tr. at 273). At a follow-up visit on February 20, 2007, Dr. Mazagri found that the incision was healing well, although Claimant was still complaining of left shoulder

pain and numbness and tingling in both upper extremities.   (Tr. at 266).  Dr. Mazagri gave Claimant a prescription for physical therapy.  (*Id.*).

Claimant began physical therapy with Mike Kennedy of Barboursville Physical Therapy on March 8, 2007.  (Tr. at 252).  He received therapy during the month of March and was re-evaluated on April 2, 2007.  (Tr. at 250-251).  Upon re-evaluation, Mr. Kennedy indicated that Claimant had slight improvement to his cervical range of motion, but no noticeable change in his extremity range of motion.  (*Id.*).

In preparation for a follow-up visit with Dr. Mazagri, Claimant had an x-ray of his cervical spine on April 10, 2007 to evaluate the status of his fusion.  (Tr. at 269).  The x-ray demonstrated stable appearing fusion with mild reversal of cervical curvature.  (*Id.*).  Two days later, Dr. Mazagri noted that Claimant's symptoms had improved, although he still had tingling and numbness in the hands with some bilateral grip weakness, and some neck pain.  (Tr. at 310).  Dr. Mazagri recommended continued physical therapy and gave Claimant a prescription for Naprosyn and Lortab.  (*Id.*).

Claimant continued with physical therapy through June 2007.  On June 4, 2007, Mr. Kennedy wrote to Dr. Mazagri confirming that he had continued to work with Claimant to restore his range of motion and found that Claimant's cervical range and extremity range continued to vary.  Mr. Kennedy opined that there was "a strong subjective component to [Claimant's] clinic presentation."  (Tr. at 357).  Mr. Kennedy suggested a functional capacity evaluation once Claimant had reached maximum medical improvement.  (*Id.*).

On June 7, 2007, Dr. Mazagri wrote to Dr. Rodney Thompson to update him on Claimant's status.  (Tr. at 312).  Dr. Mazagri confirmed that Claimant had undergone a diskectomy with some improvement in symptoms, although he continued to experience

tingling in his left arm.  Dr. Mazagri advised that physical therapy did not seem to be helping with this problem, so Claimant was given a TENS unit and told to use ultrasound and heat.  He was also given a prescription for Lyrica and continued to take Naprosyn and Lortab.  (*Id.*).  On physical examination, Dr. Mazagri noted that Claimant moved all four extremities well with good strength; had a normal gait; and had only "mild" restriction of neck movements. (*Id.*).  However, approximately six weeks later, Dr. Mazagri wrote to Dr. Thompson again, indicating that Claimant was now complaining of recurring pain in his neck associated with stiffness and radiation to both arms, more on the left, with tingling and numbness.   (Tr. at 313).  Dr. Mazagri did not report any significant findings on examination, stating that Claimant moved his extremities well and had only "mild" tenderness over his cervical spine with restriction of movement.  He recommended an MRI as well as nerve conduction studies.  (*Id.*).

The MRI was completed in September and was interpreted to show "Anterior cervical fusion changes C4-5 with no osseous complication of the prior surgery. Localized bright T2 cord signal at C4-5 without contrast enhancement, likely representing gliosis.  Osteophytic neural foraminal stenosis suspected on the left at C3-4, on the right at C4-5 and C5-6."  (Tr. at 319).   The nerve conduction studies revealed "1. Bilateral ulnar neuropathy at the elbow, mild to moderate on the right and moderate to severe on the left; 2. Mild bilateral carpal tunnel, worse on the right; 3. Old C5 radiculopathy."  (Tr. at 323).

After receiving these results, Dr. Mazagri wrote to Dr. Thompson and related the findings.  (Tr. at 315).  Dr. Mazagri indicated that on physical examination, Claimant had normal muscle strength in all extremities; he walked with a normal gait and without limping; his neck movements were mildly restricted in extension, lateral rotation and

lateral bending; and the Tinel's sign and Phalen's sign were both negative. (*Id.*). Dr. Mazagri suggested a functional capacity assessment in relation to a return to work. (*Id.*).

Also in September, Claimant followed-up with Dr. Carico regarding his other medical conditions. (Tr. at 367- 369). During these encounters, Dr. Carico diagnosed Claimant with Type II diabetes, uncomplicated, uncontrolled. He prescribed medication to control Claimant's blood sugar and scheduled a return visit. (*Id.*). At a return visit on December 4, 2007, Dr. Carico found Claimant's blood pressure to be 160/80 and his home blood sugars to range between 120-168. (Tr. at 366). Dr. Carico refilled Claimant's medications and changed his diabetes medication to Glucophage. He asked Claimant to return in three months for reassessment. (*Id.*).

On November 29, 2007, Dr. Mazagri had his final visit with Claimant. (Tr. at 393-394). He noted that Claimant's neck symptoms had improved, but he continued to have symptoms in his arms. Claimant also was complaining of back pain with radiation to his right leg, involving the back of the thigh to the knee. (*Id.*). Upon examination, Dr. Mazagri observed Claimant walking normally without a limp; his muscle strength was normal in all extremities with intact sensation; his lumbar flexion and extension were mildly restricted, as was his neck extension, lateral rotation and lateral bending. (*Id.*). Subsequently, Dr. Mazagri added an addendum opining that Claimant had reached "maximum medical improvement from a neurosurgical viewpoint regarding his cervical and shoulder injury of 4-26-06." (*Id.*).

On March 11, 2008, Dr. Carico evaluated Claimant's hypertension and diabetes. (Tr. at 403-406). He concluded that Claimant's Type II diabetes was not well controlled and his hypertension was essentially unchanged. (*Id.*). Dr. Carico adjusted Claimant's

medications and told him to return in three months.  Claimant did not recontact Dr. Carico until August 18, 2008.  (Tr. at 402).  On this date, Dr. Carico documented that Claimant's lumbar radiculopathy had been "successfully treated with Neurontin."  (*Id.*).

Slightly over one month later, Claimant returned to Dr. Carico's office for complaints of "not feeling well, trouble breathing."  (Tr. at 398-401).  Claimant reported that he "gets tired with the least amount of work."  He stated that he "has not worked in some time" and was "seeking social security disability."  (*Id.*).  On examination, Dr. Carico observed that Claimant had trouble getting up from the chair and walked with a limp.  He further noted that Claimant was having chest pain, which was concerning, because he had several risk factors for coronary artery disease.  Dr. Carico recommended that Claimant proceed to the ED at St. Mary's Medical Center to be admitted for a cardiac work-up, including a cardiac catheterization.  (*Id.*).

Claimant apparently followed this advice, because the records next contain a progress note prepared by Dr. Abdolreza Agahtehrani, a cardiologist with HIMG, dated October 20, 2008, which documented that Claimant underwent a left heart catheterization that showed multi-vessel disease.   (Tr. at 419-420).  He had a stent placed during the procedure.  Dr. Agahtehrani commented that Claimant had a history of a non-ST myocardial infarction with a strong family history for premature coronary disease.  In light of these factors, Dr. Agahtehrani planned to refer Claimant for stenting of the right coronary artery.  (*Id.*).

In January 2009, Claimant underwent a second cardiac catheterization at St. Mary's Medical Center after complaining of worsening chest pain for a week.  (Tr. at 429, 449-453).  During this procedure, Dr. Agahtehrani found stenosis of the mid right coronary artery and placed another stent. (Tr. at 437).  Claimant was discharged with

instructions to continue with outpatient cardiology care.  (*Id.*).

On March 2, 2009, Dr. Carico completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form at the request of Claimant's counsel.  (Tr. 20, 467-469).  Dr. Carico opined that Claimant was limited to lifting/carrying no more than 10 pounds, based upon Claimant's statement that the neurosurgeon had given him this limitation.  (Tr. at 467).  He further indicated that Claimant could walk up to a maximum of 15 minutes uninterrupted and 1 hour total in an 8 hour workday; could sit no more than 30 minutes uninterrupted and 1 hour total; could never climb, balance, stoop, crouch kneel, or crawl.  Dr. Carico suggested in his corresponding explanations for these limitations that this information was essentially provided by Claimant.  He added that Claimant should avoid all environmental exposures due to his neuropathy, radiculopathy, back pain and lack of certain skills.  Finally, Dr. Carico opined that Claimant "cannot work in current condition."  (*Id.*).

### B.    Worker's Compensation and SSA Evaluations

On May 9, 2007, Dr. Prasadarao Mukkamala examined Claimant at the request of his employer's Worker's Compensation carrier.  (Tr. at 237-244).  At the time of this evaluation, Claimant had not been diagnosed with diabetes, but had been diagnosed with hypertension.  He had no known cardiac or pulmonary ailments.  His primary complaints involved pain in his neck and arms, with stiffness, tingling and numbness in his hands.  (*Id.*).  Claimant mentioned that he could carry out his activities of daily living well.  On examination, Dr. Mukkamala found that Claimant was hesitant to perform a full range of motion with his shoulders due to neck pain, but otherwise his range of motion was essentially normal; Claimant's motor, sensory, grip strength, and deep tendon reflexes were all normal.  Claimant had a normal gait and revealed no

abnormalities in his lower extremities.  Dr. Mukkamala concluded that Claimant had reached his maximum medical improvement and likely would not be able to return to his former employment.  He suggested a functional capacity evaluation and a vocational evaluation to determine what other type of work Claimant could perform.  Dr. Mukkamala opined that Claimant's whole person impairment totaled 25%.  (*Id.*).

On August 27, 2007, SSA consultant Dr. Porfirio Pascasio completed a Physical Residual Functional Capacity Assessment. (Tr. 287-295). He documented that Claimant had degenerative disc disease of the cervical spine with myelopathy and was status post diskectomy with fusion and grafting.  Claimant also had hypertension as a secondary diagnosis.  Dr. Pascasio determined that Claimant's exertional limitations restricted his ability to lift/carry to 20 pounds occasionally and 10 pounds frequently; he could sit, stand, and walk about 6 hours, each, in an 8 hour workday; and his ability to push and pull was unlimited.  (*Id.*).  He indicated that Claimant's postural limitations allowed only occasional climbing of ramp/stairs, no climbing of ladder/rope/scaffolds, and only occasional balancing, stooping, kneeling, crouching and crawling. Dr. Pascasio opined that Claimant had no manipulative, visual or communicative limitations, but he was limited in his exposure to extreme cold or heat and to hazards.  (*Id.*).

On January 24, 2008, Dr. Caroline Williams completed a Residual Functional Capacity Assessment for the SSA.  (Tr. at 383-390).  Dr. Williams noted that Claimant was status post cervical diskectomy and fusion with a secondary diagnosis of bilateral ulnar neuropathy and co-morbidities of obesity, hypertension, hyperlipidemia, and Type II non-insulin dependent diabetes.  (*Id.*).  Dr. Williams assessed Claimant's exertional limitations restricted him to lifting/carrying 20 pounds occasionally and 10 pounds frequently; to sit, stand, and walk, about 6 hours each in an 8 hour workday; and to

push and pull without limitation.  (*Id.*).  She indicated that Claimant's postural limitations included only occasional climbing of ladder/rope/scaffolds and occasional crawling.  She determined that Claimant had no manipulative, visual or communicative limitations, but he was limited in his exposure to extreme cold, vibration, and hazards. (*Id.*).  Dr. Williams opined that the medical evidence review did not "support presence of significant impairment limitations, conditions/findings that meet SSA criteria nor the degree of disability claimant alleges and therefore, RFC reduced to light exertional with postural and environmental limitations as noted."  (Tr. at 288).

## VI.  __Claimant's Challenges to the Commissioner's Decision__

Claimant's challenges can be divided into three distinct categories.  The first category includes allegations that the ALJ failed to appreciate the impact that Claimant's musculoskeletal impairments, resulting pain, and constellation of ailments had on his ability to engage in substantial gainful activity.  (Pl. Br. at 7-10).  As part of this category, Claimant takes issue with the ALJ's credibility assessment and with his apparent disregard of the synergistic effect of Claimant's heart disease when combined with his musculoskeletal impairments.  (*Id*).  The second category involves the ALJ's treatment of the medical source opinions; in particular, the ALJ's discrediting of the residual functional capacity assessment completed by Claimant's treating physician, Dr. Carico. (Pl. Br. at 11).  The third and last category of challenges can be described as alleged inadequacies of the record and include the ALJ's purported failures to develop the record and rebut the "presumption of disability."  (Pl. Br. at 12-13).

In response, the Commissioner argues that the ALJ carefully evaluated and considered the totality of the evidence and reached a decision that is supported by substantial evidence.  According to the Commissioner, the ALJ (1) properly analyzed

Claimant's credibility using the two step-process; (2) provided a strong basis for his rejection of Dr. Carico's RFC opinion; (3) fully developed the record relevant to the crucial issues; and (4) had no duty to rebut a presumption of disability, because such a presumption does not legally exist. (Def. Br. at 9-19).

Having thoroughly considered the evidence and the arguments of counsel, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## VII.   <u>Analysis</u>

### A.    The ALJ's Consideration of the Impact of Claimant's Impairments

Claimant contends that the ALJ erroneously ignored key aspects of Claimant's impairments, which—especially when viewed in combination—had a far greater negative impact on his ability to work than was acknowledged. In particular, Claimant points to the numbness in his hands and loss of grip strength; his severe and unrelenting pain; and his heart disease, which caused him significant fatigue. Claimant aptly states that the ALJ was required to consider the combined synergistic affect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). As the Fourth Circuit Court of Appeals stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker v. Bowen, supra* at 50.

Here, the ALJ fulfilled his obligation to evaluate Claimant's impairments, separately and in combination, specifically addressing how they affected Claimant's

functional capacity.  (Tr. at 11-14 ).  The ALJ noted that since having the diskectomy, Claimant's neck pain had improved as did his cervical range of motion. At the time of his discharge from Dr. Mazagri's care, Claimant had only mild restrictions of neck extension, lateral rotation and lateral bending.  (Tr. at 393).  While he continued to complain of numbness and tingling in his arms, Claimant's grip strength was never found to be significantly reduced.  In fact, Dr. Mazagri documented only minimal weakness, with improvement after treatment.  At the final visit, Dr. Mazagri indicated that Claimant's muscle strength was normal in all extremities and his sensation was intact.  (*Id.*).  As the ALJ emphasized, Claimant Tinel's and Phalen's signs were never noted to be positive, and he did not use wrists splints or other aids to relieve symptoms associated with ulnar neuropathy and carpal tunnel syndrome.    (Tr. at 12). Furthermore, none of Claimant's physicians recommended surgery to improve Claimant's use of his hands and wrists.  Finally, Claimant's musculoskeletal impairment of the lumbar spine added little to Claimant's overall restrictions. Dr. Mazagri confirmed in the medical records that Claimant walked normally, without a limp, and had no bladder or bowel dysfunction.  (Tr. at 307, 310, and 313).  Claimant did not wear a brace or other type of back support. (Tr. at 25).  He did not receive specialty care for his back complaints, testifying at the administrative hearing that he saw only Dr. Carico, a family doctor, for his back pain.  (Tr. at 26).    No physician ever recommended surgical intervention to correct his lumbar spine.  All of these undisputed facts support the ALJ's conclusion that Claimant's combined musculoskeletal impairments did not render him disabled.

In any event, the ALJ took these limitations into account in his RFC.  He commented that Claimant continued to have symptoms since his surgery, which were

considered by the agency physicians in completing their RFC assessments.   These consultants found, in spite of the limitations described by Claimant and noted in the medical record, Claimant was exertionally able to perform work within the light range.   The ALJ then further restricted the RFC by including additional non-exertional limitations consistent with those that the consultants felt were substantiated.   (Tr. at 14).

The ALJ also considered the effect of Claimant's diabetes, hypertension, heart disease, and pain on his overall ability to function.   He noted that Claimant was able to complete all activities of daily living without difficulty.   Claimant cooked, did laundry, shopped, did light housework, drove, and regularly visited with friends.   (Tr. at 12).   He had no restrictions on his driver's license.   (Tr. at 154).   Claimant confirmed that he could concentrate for "as long as needed;" could follow instructions; handled stress appropriately; and had no problem getting along with authority figures.   (Tr. at 156-157).   He expressed no concerns over handling money or managing daily chores.   (Tr. at 153-155).   At his most recent medical evaluation in January 2009, Claimant's blood pressure was well-controlled at 120/60; he had no shortness of breath; and he claimed his blood sugar control was fair.   (Tr. at 450-451).   Upon examination, the treating physician documented no abnormal musculoskeletal or neurological findings.   (Tr. at 451).   The physician noted that Claimant had a history of chronic pain syndrome for which he was prescribed Lortab and Neurontin.   (Tr. at 453).   As no changes were made to these medications, the physician presumably concluded that they were sufficient to manage the extent of Claimant's pain symptoms.

In regard to Claimant's pain and other symptoms impairments, the ALJ assessed their persistence and intensity by evaluating Claimant's credibility through the

appropriate two-step process.  Under 20 C.F.R. § 404.1529, the ALJ was expected to make a finding about the credibility of Claimant's inidividual statements regarding pain and other symptoms and their functional effects.  First, the ALJ was required to establish whether Claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the symptoms that Claimant alleged. SSR 96-7p.  Once the ALJ found that to be the case, he was mandated to evaluate the intensity and persistence of the symptoms to determine the extent to which they prevented Claimant from performing basic work activities. *Id.* Whenever the intensity and persistence of alleged symptoms cannot be established by objective medical evidence, the ALJ must make a finding on the credibility of any statements used to support their disabling effect. Social Security Ruling 96-7p sets forth the specific factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the ultimate credibility determination. The Ruling further directs the ALJ to base the credibility determination on a consideration of all of the evidence in the case record.  *Id.*

Here, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms; thus, the ALJ evaluated the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they prevented him from working. The ALJ found that Claimant's statements concerning the intensity, persistence, and limited effects of his symptoms were excessive and not credible, because they were inconsistent with other evidence in the record, including descriptions of Claimant's daily activities; his lack of recent treatment for his knees and back; the documented success of his neck surgery;  the lack of positive findings indicating significant ulnar neuropathy and carpal tunnel syndrome;

his lack of wrist, neck, and back supports and aids; the limited evidence of neurological impairment; Claimant's failure to consider or pursue other types of employment; the minimal objective findings on range of motion tests; and the lack of evidence that Claimant had an impairment of his ability to manipulate or use his hands and fingers. (Tr. at 12).  As the ALJ explained, given all of the above, Claimant's "allegations of disabling pain are deemed excessive, not fully credible, and are treated accordingly." (Tr. at 12).

Having scrutinized the ALJ's decision and the evidence in its totality, the Court finds that the ALJ thoroughly considered Claimant's impairments and made determinations that were supported by substantial evidence.  Similarly, the ALJ conducted a proper review of the evidence to assess Claimant's credibility and the ALJ's ultimate finding in that regard has substantial evidentiary support.  Finally, the ALJ plainly took into account the totality of Claimant's restrictions flowing from his severe and non-severe impairments, including pain and heart disease, and accounted for any consequential enhancement of functional limitations in the RFC finding.

### B.    Weight of Medical Source Opinions

Claimant next alleges that the ALJ failed to follow the social security regulations and case law in the weight he afforded the functional capacity evaluation of Dr. Carico, Claimant's treating physician. (Pl.'s Br. at 11).   On March 2, 2009, Dr. Carico completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form at the request of Claimant's counsel. Dr. Carico placed severe restrictions on Claimant's exertional and non-exertional functions and concluded with a statement that "i[n] my opinion patient cannot work in current condition."  (Tr. at 467-469).  In his decision, the ALJ explicitly rejected the assessment as being non-persuasive, explaining as follows:

> At the time of the hearing the claimant's representative submitted an assessment from Dr. Carico essentially restricting the claimant to less than sedentary exertion (Exhibit 23F).  The undersigned finds that this assessment lacks any specific supporting clinical signs or findings and is instead based directly on the claimant's subjective complaints.  Dr. Carico's own notes do not support this degree of restriction noting only a single finding of limp [sic] numbness.  The claimant has improved since his fusion surgery and the undersigned does not find that this degree of restriction is supported by the medical evidence.

(Tr. at 13-14).

In evaluating the opinions of medical sources, the Commissioner generally must give more weight to the opinion of a treating physician, who is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 404.1527(d) (2) (2008).  Nevertheless, a treating physician's opinion is alloted **controlling weight** "only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  *Ward v. Chater,* 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (2008).  The opinion of a treating physician must be weighed against the record as a whole when determining its consistency with the evidence.  20 C.F.R. §§ 404.1527(d)(2) (2000).

20 C.F.R. § 404.1527 details the process by which the SSA will consider medical source opinions in deciding whether a claimant is disabled.  According to 20 C.F.R. § 404.1527(d), "[r]egardless of its source, we [the SSA] will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2), we consider all of the following factors in deciding the weight we give to any medical opinion." Consequently, if the ALJ determines that a treating physician's opinion should not be given controlling weight, the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(d) in weighing all of the medical opinions, including those of the

treating physician.  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, by extension, than to non-examining sources). Section 404.1527(d)(2)(i) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Ultimately, it is the responsibility of the Commissioner, not the Court, to review the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Court's obligation is to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

After reviewing the opinion of Dr. Carico and the ALJ's written decision, the Court is of the opinion that the ALJ fully complied with the applicable regulations and

rulings in his treatment of Dr. Carico's evaluation.   The ALJ found that Dr. Carico's RFC assessment plainly fell short in terms of supportability and consistency.   The Court agrees with this finding.

First, the ALJ compared the limitations noted by Dr. Carico with the objective clinical findings and determined that the contemporaneous medical records did not support the severity of restriction indicated by Dr. Carico.  In particular, Dr. Mazagri's documentation reflected significant post-operative clinical improvement in Claimant's neck impairment, which was the primary source of his neck, shoulder, and arm symptoms. Claimant was noted to have only mild restrictions on examination.  He had a normal gait, with no evidence of limping, and moved without assistive devices. His muscle strength was normal in all four extremities and his sensation was intact. (Tr. at 317).  In addition, Dr. Carico's office record of September 30 2008, which appeared to reflect Claimant's most recent visit with Dr. Carico, revealed that Claimant was in no acute distress and, other than a limp, had no abnormal musculoskeletal findings.  (Tr. at 400).  As a whole, Dr. Carico's records did not contain notations reflecting significant musculoskeletal impairments; in fact, most of the entries related to Claimant's musculoskeletal system were normal.   (Tr. at 404, 406, 410-411).   Similarly, the admission assessment performed at St. Mary's Medical Center on January 8, 2009, documented strong bilateral hand grips, no impairment of upper limbs, normal extremities, and a steady gait.  (Tr. at 425).  When asked if he was in pain, Claimant described only chest pain that was intermittent, rated 4/10 in intensity, was relieved by pain medication, and had no effect on his activities of daily living.  (Tr. at 428).

Next, the ALJ examined the sources supporting Dr. Carico's function-by-function assessment and concluded that Dr. Carico had relied almost exclusively on the

subjective statements of Claimant.   A review of the form completed by Dr. Carico substantiates the ALJ's conclusion.   For example, when asked to supply the medical findings that supported his determination that Claimant was restricted to lifting and carrying no more than 10 pounds, Dr. Carico referenced Claimant's report that his neurosurgeon established this restriction.   Likewise, Dr. Carico based his assessment of postural limitations on alleged "directions" from Claimant's neurosurgeon, as they were reported by Claimant.   Notably, none of these purported restrictions are found in the post-operative records prepared by Dr. Mazagri.   The remaining restrictions documented by Dr. Carico appear to be based upon Claimant's statements of his limitations.   Inasmuch as the ALJ did not find Claimant's statements about the intensity, persistence, and limiting effects of his symptoms to be credible, the ALJ reasonably discounted the weight of Dr. Carico's assessment.

Regarding Dr. Carico's opinion that Claimant was unable to work, the ALJ acted within his discretion to disregard it.   SSR 96-5p.   Social Security Ruling 96-5p states: "Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." An example of such an issue is "[w]hether an individual is 'disabled' under the Act." *Id.* "The regulations provide that the final responsibility for deciding issues such as [whether an individual is disabled] is reserved to the Commissioner." *Id.* Therefore, the ALJ was required to consider Dr. Carico's opinion that Claimant was unable to engage in any work activity, an issue reserved to the Commissioner, to the extent required by SSR 96-5p:

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

SSR 96-5p. As noted above, the ALJ analyzed the evidence in its totality and concluded that the objective findings did not support the extent of the restrictions identified by Dr. Carico. Further, the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms was not sufficiently strong to substantiate a finding of disability.

The ALJ expressly adopted the function-by-function assessments of the State agency consultants, finding that Claimant was more properly restricted to light level exertional work. (Tr. at 13). These assessments were also consistent with the evaluation completed by Dr. Mukkamala for the Worker's Compensation carrier. (Tr. at 237-244). Certainly, none of these physicians suggested that Claimant was without severe impairment or that he could return to his prior relevant work. Instead, they opined that he had specific exertional and non-exertional restrictions. Taking those restrictions into account, the ALJ appropriately relied upon the testimony of a vocational expert and found that jobs did exist in significant numbers in the national and regional economy that Claimant could perform.

## C.    Alleged Failures of the Record

Claimant's last category of challenges includes allegations that the ALJ failed to fully develop the record and rebut "the presumption of disability." In *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), the Fourth Circuit Court of Appeals noted that an ALJ has a "responsibility to help develop the evidence." *Cook v. Heckler*, *supra* at 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore

all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." *Id.* In *Cook,* the ALJ made a determination that the claimant's arthritis did not meet or equal a listed impairment presumably without having any evidence in the record that was pertinent to the criteria of the listed impairment. *Id.* The Court identified some of the medical findings that should have been considered in determining whether or not the claimant met the listed impairment, adding "[w]ithout any of the tests and physician's opinions described above, it is impossible to tell whether Cook meets the requirements in the list of impairments. It must have been impossible for the ALJ to tell whether she did or did not. Thus, his failure to ask further questions and to demand the production of further evidence, as permitted by 20 C.F.R. § 404.944, amounted to neglect of his duty to develop the evidence." The errors of the ALJ in *Cook v. Heckler,* however, were not mirrored in the present case.

While the ALJ in this case had a duty to fully and fairly develop the record, he was not required to act as Claimant's counsel. *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994). The ALJ had the right to assume that Claimant's counsel was presenting Claimant's strongest case for benefits. *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009), citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387,391 (7th Cir. 1987). His responsibility was to insure that the record contained sufficient evidence upon which to make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); See also, *Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.). When retrospectively reviewing the adequacy of the record, the Court must look for evidentiary gaps that resulted in "unfairness or clear prejudice" to the claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980). The Court should

remand a case for the failure of an ALJ to adequately develop the record only when these circumstances exist. *Id.*

In the present case, Claimant argues in his response to the Commissioner's Motion for Judgment on the Pleadings that the ALJ erred by not fleshing out the record related to Claimant's coronary artery disease and its affects on his ability to work. (Pl. Resp. Br. at 1). The Court does not find this argument persuasive. The ALJ had the medical records, which detailed Claimant's treatment for coronary artery disease. He obviously reviewed and considered them, because he expressly found that Claimant's heart disease did not constitute a severe impairment. (Tr. at 10). The records indicate that at the time of Claimant's discharge post-stent placement his blood pressure was normal; his oxygen saturation level was normal; he had no chest pain; he had no form of distress; he was awake and alert; he had no complaints post procedure; and he had no shortness of breath. (Tr. at 438-439). The narrowing of his arteries had been effectively treated with the stents; accordingly, the medical records are void of evidence that Claimant's coronary artery disease had more than a minimal impact on his future ability to perform basic work activities. Moreover, at the administrative hearing, Claimant had several opportunities to testify regarding the effects of his cardiac condition on his ability to function; yet, he failed to even mention it until prompted by counsel. (Tr. at 34). Despite originally overlooking that medical condition, Claimant did provide testimony regarding the symptoms associated with his heart disease. Therefore, the Court finds that the record was sufficiently developed on that issue and no prejudicial evidentiary gaps are evident.

Claimant's contention that the ALJ did not carry his burden to rebut the "presumption of disability" is equally without merit. Claimant is ultimately responsible

for proving that he is disabled.  This responsibility never shifts to the Commissioner, but remains with Claimant.  As such, he bears the burden of providing medical evidence to the Commissioner which establishes the severity of his impairments.  20 C.F.R. §§ 404.1512(a) and 416.912(a).  *See Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, Claimant "bears the risk of non-persuasion."  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056 (4th Cir. 1976).

At the fourth step of the sequential disability evaluation, the SSA recognizes that when a claimant proves the existence of severe impairments, which prevent the performance of past relevant work, the claimant has established a *prima facie* case of disability.  The burden then shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§404.1520(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work

experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569.  However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform.  *Id.*  For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs.  *Id.*  In those cases, the ALJ must prove the availability of jobs through the testimony of a vocational expert.  *Id.*  As a corollary to this requirement, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. See *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, the ALJ recognized that Claimant's impairments resulted in a combination of exertional and nonexertional impairments.  Therefore, he properly relied upon the testimony of a vocational expert in determining that jobs existed in significant numbers in the national economy that Claimant could perform.  (Tr. at 35-37).  Claimant makes no argument that the vocational expert was not qualified to render opinions, or that her opinions were based upon incomplete or inaccurate hypothetical questions.  Indeed, the vocational expert was present throughout the administrative hearing and had the opportunity to listen to Claimant's descriptions of his medical conditions and their resulting functional limitations.  Despite the totality of Claimant's restrictions, the vocational expert found light and sedentary exertional level positions

that Claimant could perform. Moreover, the vocational expert verified that her opinions were consistent with the Dictionary of Occupational Titles. (Tr. at 38-39).   In view of these circumstances, the Court finds that the ALJ fulfilled his obligation to produce expert testimony on the subject of job availability individualized to the Claimant. Consequently, the decision of the Commissioner that Claimant was not under a disability is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  February 11, 2011.

Cheryl A.  Eifert
United States Magistrate Judge